(No. 69387

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. IKE J. EASLEY, JR., Appellant.

*Opinion filed April 16, 1992.—Rehearing denied June 1, 1992.*

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen and Bradley P. Halloran, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

On October 16, 1987, defendant, Ike J. Easley, Jr., was indicted on two counts of conspiracy (first degree murder) (Ill. Rev. Stat. 1987, ch. 38, par. 8—2(a)) and five counts of first degree murder (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2)). The conspiracy counts against defendant were dismissed by the State before trial. Defendant was accused of killing Robert Taylor, a superintendent at the Pontiac Correctional Center (Pontiac), on September 3, 1987.

Following a jury trial in the circuit court of Livingston County, defendant was convicted of first degree murder. At a separate sentencing hearing, the same jury found defendant eligible for the death penalty on the ground that defendant's victim was a correctional officer, a statutory aggravating circumstance. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(2).) The jury concluded that there were no mitigating factors sufficient to preclude imposition of the death penalty, and the trial judge therefore sentenced defendant to death. Defendant's death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rules 603, 609(a).

On appeal, defendant argues that (1) his right to cut off questioning after being advised of his *Miranda* rights was not "scrupulously honored" by the police, which argument we reject; (2) the police engaged in "coercive behavior" and "overreaching" in violation of the due process clause in order to obtain an inculpatory statement from defendant, which argument we agree with, although we find that any error which may have resulted from the trial court's ruling on the admissibility of this statement was harmless beyond a reasonable doubt (*People v. Howard* (1991), 147 Ill. 2d 103); (3) his fifth amendment right against self-incrimination was denied where testimony at trial revealed that defendant had invoked his right to remain silent after receiving the *Miranda* warnings, which argument we agree with, although we find that defendant has waived review of this error (*People v. Young* (1989), 128 Ill. 2d 1, 38) and the plain error rule is inapplicable (*People v. Hayes* (1990), 139 Ill. 2d 89, 143); (4) gang-related evidence introduced at trial in support of the State's motive for Taylor's death was improperly introduced at trial and (5) argued in the State's closing argument, which arguments we agree with, although we find that neither error denied

defendant a fair trial or resulted in substantial prejudice (*People v. Smith* (1990), 141 Ill. 2d 40); (6) he was denied a fair trial by the State's introduction of victim impact testimony during the guilt stage of his trial, which argument we reject (see, *e.g., People v. Del Vecchio* (1989), 129 Ill. 2d 265); (7) the State used improper cross-examination techniques with two of his witnesses, which alleged error we find defendant has waived (*People v. Enoch* (1988), 122 Ill. 2d 176, 186) and plain error is inapplicable; (8) improper wording in the oral and written instructions given to the jury resulted in an improper finding of guilt, which argument we agree with, although we find that the error was harmless (*People v. Tiggs* (1976), 38 Ill. App. 3d 72); (9) he was denied effective assistance of counsel where his counsel argued at the first stage of the sentencing hearing that defendant would sustain his burden to show that defendant's life would be spared, which argument we dispose of on the basis of lack of sufficient prejudice (*Strickland v. Washington* (1984), 466 U.S. 668, 697, 80 L. Ed. 2d 674, 699, 104 S. Ct. 2052, 2069); (10) it was error for the trial court to instruct the jury that it could consider his potential for rehabilitation as a mitigating factor at the second stage of the sentencing hearing, which argument we reject (*People v. Lego* (1987), 116 Ill. 2d 323, 350); (11) an outburst from Taylor's wife during closing argument at the sentencing hearing, coupled with the trial court's admonishment to the jury subsequent to the incident, has been condemned by the United States Supreme Court in *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, which argument we reject (*Payne v. Tennessee* (1991), 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597); (12) statements made by the prosecutor in his closing statement were improper and warrant a new trial, which argument we find defendant has waived (*People v. Barrow* (1989), 133 Ill. 2d 226, 270) and plain

error is inapplicable (*People v. Mack* (1984), 105 Ill. 2d 103, 131-32); (13) the jury was improperly presented at the sentencing hearing with evidence of numerous offenses for which defendant had been charged but not convicted, which argument we reject (*People v. Ramirez* (1983), 98 Ill. 2d 439, 460); (14) various aspects of the Illinois death penalty statute violate the eighth and fourteenth amendments; and (15) the Illinois death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentence, both of which arguments we reject (*People v. Howard* (1991), 147 Ill. 2d 103). For the reasons set out below, we affirm the judgment of the circuit court.

Superintendent Taylor was killed in his office at Pontiac on the morning of September 3, 1987. A "shank," or homemade knife, was recovered from the office and identified as the weapon used to murder Taylor. At trial, inmate Lawrence Spillar testified to the following events occurring sometime prior to 11 a.m. on September 3, 1987. On that date, Spillar was housed in cell 811 on gallery eight in Pontiac. That morning, he and inmate Charles Nealy were talking to Taylor in his office, a converted inmate cell, number 552, located on gallery five in Pontiac. Spillar and Nealy were seated on opposite sides of the entrance to the office and Taylor was seated behind a desk, facing the two inmates.

As the three men spoke, defendant ran into the office, jumped on Taylor's desk and struck him in the face. Defendant then pulled a knife from his belt and appeared to stab Taylor. Spillar collided with another inmate, Roosevelt Lucas, who was entering Taylor's office as Spillar ran from it. Spillar saw Lucas hitting Taylor with a pipe before he, Spillar, ran out of Taylor's office to stand on the gallery in front of cell 546. Spillar watched defendant and Lucas as they ran from Taylor's

office and down the gallery. Spillar testified that when defendant ran from Taylor's office, he was hurriedly discarding gloves, coat and hat as he ran down the corridor. He saw Lucas throw the pipe back into Taylor's office before he ran to the front of the gallery and jumped onto gallery seven. Spillar then ran into cell 546. Nealy was already in the cell when Spillar entered it.

Spillar stated that he agreed to testify because he was afraid that he would be charged with Taylor's murder and because he was afraid of being killed by a gang. Spillar testified that he was in a different gang than defendant or Lucas, who were members of the same gang, and the two gangs were not allied.

Inmate Demetre Brown, who was housed in cell 549, testified that shortly before 11 a.m. on September 3, 1987, he was standing on gallery five in the area of Taylor's office. Brown saw defendant sitting on a radiator located three cells from Taylor's office. Defendant was putting on a cap and gloves and was wearing "all blue state clothes," a winter coat and white gym shoes. Lucas was with defendant, and he, too, was putting on gloves and a cap. Brown testified that "when I seen them putting on gloves and *** caps I figured something was up so, I just got away from him and went over and sit [sic] by the window in front of the Superintendant's office."

Brown saw Spillar and Nealy sitting in Taylor's office with Taylor. Brown then saw defendant and Lucas run into Taylor's office and saw defendant stab Taylor. Brown ran from where he was outside Taylor's office into cell 546 with Spillar and Nealy.

Correctional Officer Robert Baremore testified that immediately after Taylor was attacked, he locked the inmates into the cells on gallery five. Brown yelled to Baremore from cell 546, then whispered to him as he approached the cell, "They're in here." Spillar and Nealy

were in the cell with Brown. In his testimony at trial, Brown denied telling Baremore that Nealy and Spillar had murdered Taylor.

Correctional Officer Walter Turner testified that he worked on the gallery across from gallery five. Shortly before Taylor was killed, a resident asked Turner to open his cell. As Turner did so, he heard a call on his radio that Taylor had been attacked.

Turner arrived at gallery five after Taylor had been attacked and helped lock the inmates who were on the gallery into cells. Turner testified that defendant, who was locked alone in cell 507, was wearing a white t-shirt and white tennis shoes. Turner saw no blood on defendant's clothing.

Correctional Lieutenant Shettleworth testified that shortly before Taylor was attacked, an inmate asked him to let him into his cell on gallery seven. As Shettleworth opened the inmate's cell, he heard a call saying Taylor had been attacked. Shettleworth went to gallery five, arriving three or four minutes after the call. Shettleworth testified that he had seen defendant near Taylor's office on September 3, before Taylor was attacked. At the time, defendant was wearing a heavy coat.

Correctional Officer Don Lyons testified that on September 3, 1987, he was working near Taylor's office. He heard a noise and saw Taylor stumble out of his office and fall to the ground. Lyons testified that he had spoken to defendant earlier that morning. At the time, defendant was sitting near Taylor's office, wearing a heavy jacket.

Correctional Captain Donald Whitaker testified that on September 3, 1987, before Taylor was killed, Whitaker had seen Brown, Spillar, Nealy, and defendant on galley five. Brown and Nealy's cells were on gallery five while Spillar and defendant's cells were on gallery eight. Defendant was housed in cell 850, but according to Whi-

taker, it was not unusual for inmates from other galleries to be near Taylor's office. Defendant was wearing a heavy coat.

After Taylor was killed, Whitaker noticed a cell near Taylor's office with three inmates in it. He testified that he went to the cell "because I knew that those inmates either did it or knew who did it." Whitaker approached Brown in the cell, who whispered to Whitaker that he knew who had killed Taylor.

Crime evidence technician Edward Kallel collected a metal pipe, a shank, gloves, a sheet of computer paper marked with a shoe print, and blood samples from the scene of the murder.

Steven Kasarsky, a fingerprint examiner, examined the shank and testified that after unraveling the tape that formed the handle of the shank, he found only a single fingerprint suitable for testing. The print on the handle of the shank matched defendant's fingerprint. Defendant's fingerprints were not found on any other item taken from Taylor's office.

Michael Kreiser of the Illinois State Police examined a piece of computer paper removed from Taylor's office that had a footprint on it. Kreiser testified that the print left on the computer paper was made with the left shoe of a pair of gym shoes removed from defendant's cell.

Richard Ores, the Pontiac evidence custodian, testified that he removed clothing and tennis shoes from defendant's cell in "the evening hours" of September 3. The clothes and shoes were damp, as if they had recently been washed or soaked. He did not know if any of those items belonged to defendant.

A State Police serologist, Karen Kucharik, testified that she discovered only a single spot of human blood on the right shoe of the gym shoes removed from defendant's cell. The blood was on the instep above the sole. No identification could be made from the blood other

than it was human blood. Kucharik examined a pair of gloves removed from defendant's cell and recovered traces of blood on one of the gloves. It was not the same blood type as that of Taylor. No item removed from defendant's cell was shown to have Taylor's blood type on it.

Kucharik also examined a white cotton glove removed from a windowsill located across from cell 531. The glove contained human blood in a few different sites which Kucharick concluded could have come from Taylor. She examined another pair of white cotton gloves, one of which was located on an outside windowsill below cell 534 and the other of which was located on the ground outside. The gloves tested positive for the presence of human blood which had genetic markers similar to those found in Taylor's blood type.

A steel pipe found outside of cell 552 also tested positive for the presence of human blood with genetic markers similar to Taylor's, although no fingerprints were found on the pipe.

Before trial, defendant filed a motion to suppress statements he made during the two interviews conducted by Pontiac officials on September 3, 1987. Defendant argued that any statements he made during the first interview were inadmissible because he had not been advised of his *Miranda* rights. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) With regard to statements made during the second interview, he argued that although he was advised of his *Miranda* rights, his right to cut off questioning was not "scrupulously honored" by the investigators (*Michigan v. Mosley* (1975), 423 U.S. 96, 104, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326) and his statement to Long was obtained in violation of the rights guaranteed by the fifth amendment.

The trial court granted that part of defendant's motion seeking to suppress statements made in the initial interview on September 3. The trial court concluded that defendant was in custody and should have been advised of his *Miranda* rights. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) As defendant was not so advised, all statements he made during the first round of questioning were suppressed. The trial court denied that portion of defendant's motion seeking to have a statement defendant made during the second interview suppressed. The trial court concluded that although defendant was properly apprised of his *Miranda* rights, his statement was volunteered and was not the result of coercive behavior by the investigators.

On appeal, neither party requests review of the trial court's ruling of the admissibility of the first statement. With regard to the admissibility of the statement made during the second interview, defendant argues that the trial court's ruling was erroneous. The State argues in response that defendant was not a rightful beneficiary of the *Miranda* concerns as he was not in custody during the second interrogation and therefore any statements he made were voluntarily given.

We do not agree with the State's position that defendant was not a rightful beneficiary of *Miranda* warnings. However, because the trial court concluded that the statement to Long was voluntary and, accordingly, properly admissible at trial, we affirm the trial court's ruling allowing the statement into evidence.

After Taylor was killed, the inmates who found themselves in the area where the murder occurred were locked in cells. This consisted essentially of inmates who resided on galleries five and seven in the south cellhouse and any inmates who were housed on other galleries but were on either of these galleries when the murder occurred. Later that afternoon, these inmates were individ-

ually removed from the cells, handcuffed, and led to separate areas in the prison for questioning. Approximately 30 inmates were questioned in this first round of interviews, with each interview 10 minutes long, regardless of the information obtained. Testimony at a suppression hearing on defendant's motion from Doug Read, an internal security investigator for the Department of Corrections, revealed that the reason for the uniformity and brevity was to avoid any suspicion on behalf of the other inmates.

A second round of questioning was conducted later that evening. The focus of the investigators' interviews for the second round had narrowed. to fewer than the original 30 inmates, although the record does not indicate the number questioned. One of the inmates questioned was defendant. Defendant was handcuffed and removed from his cell, then taken to the assistant warden's office for questioning. Defendant remained handcuffed throughout the interview.

There were two investigators in the office for the interview, Read and David Brubaker, and a third, Deputy Director Gerald Long, entered the office after the questioning began. Read testified that he told defendant "[he] had information and considered him a suspect." The record does not indicate whether the Department did in fact have information connecting defendant with Taylor's murder. Brubaker then advised defendant of his *Miranda* rights and Read recorded that defendant refused to answer any questions and refused to waive his right to remain silent. Defendant did not request to speak to an attorney. Read testified at the hearing that neither he nor Brubaker asked defendant any further questions after receiving defendant's response to the *Miranda* warnings.

At this point in the questioning, Long entered the office. At the hearing, Long testified that he was advised

by the investigators that defendant had been advised of the *Miranda* warnings and refused to answer any questions about the Taylor murder. Long testified that he then said the following to defendant:

> " 'I understand you have been given your rights and you don't wish to say anything, and I do not wish to ask you any questions at this time, but I want to advise you what lies ahead.' At that point in time, I advised him that we had inmate testimony that indicates that he and another individual were the hitters or perpetrators of the murder of Superintendent Taylor and that even though he was currently institutionalized on a serious matter this was more serious in the fact that it was a capital crime and if convicted, could be subject to the death penalty."

Long testified that defendant then said to him, "all you honkey motherfuckers want is a nigger donkey to pin this case on, and I am your donkey, I am your killer." After making this statement, defendant was returned to his cell.

The trial court granted that part of defendant's motion seeking to suppress statements made in the initial interview on September 3. The trial court concluded that defendant was in custody and should have been advised of his *Miranda* rights. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) As defendant was not so advised, all statements he made during the first interrogation were suppressed.

The trial court denied that portion of defendant's motion seeking to have defendant's statement to Long during the second interrogation suppressed. In ruling on this portion of defendant's motion, the trial court considered whether Long's statement was "calculated to elicit a response" from defendant:

> "In other words, was this a calculated strategem [*sic*] by the department to first Mirandize someone when it was later discovered that they would not speak to turn the thumb screws a little tighter to make sure that all possi-

ble pressure was applied in case they might reconsider and forego their *Miranda* rights. Under these circumstances and having considered this testimony, I find that the defendant Easley's statement [made during the second interrogation] *** was volunteered. I don't find it was coerced. I do not find that this was an identifiable strategem [sic] by the department to solicit a statement."

Defendant's statement to Long was admitted into evidence at trial.

This court recently considered the necessity of advising a prison inmate of his *Miranda* warnings in *People v. Patterson* (1991), 146 Ill. 2d 445, and held that, "under the circumstances peculiar to this case," the warnings were not necessitated. (*Patterson*, 146 Ill. 2d at 447.) In *Patterson*, two shanks were found in the defendant's cell during a routine shakedown. The defendant, who was an inmate at Pontiac, was placed in segregation as a disciplinary measure after discovery of the weapons. While in segregation, the defendant was subject to certain restrictions beyond those typically employed against the inmates at Pontiac, which included being locked in his cell 24 hours per day and being escorted in restraints to all other activities conducted outside of his cell. *Patterson*, 146 Ill. 2d at 448.

After two months in segregation, the *Patterson* defendant was handcuffed and escorted to the office of an internal investigator with the Department to be interviewed. The purpose of the investigator's interview was twofold: first, to discover whether the defendant possessed the shanks to protect himself from other inmates and, second, to determine whether the defendant would have grounds for a necessity defense at a possible criminal trial. *Patterson*, 146 Ill. 2d at 449.

At the time of the interview, no criminal charges had been filed. The defendant was not advised of his *Miranda* warnings prior to his conversations with the in-

vestigator. The defendant indicated "he would be inclined to possess a weapon" because he had seen inmates attacked by other inmates. The defendant was not asked whether he possessed a weapon on the day of the shakedown and he did not comment on the events of that day. (*Patterson*, 146 Ill. 2d at 449.) The defendant was returned to segregation after the interview.

Prior to trial, the *Patterson* defendant filed a motion with the court to suppress his statements made during the interview, arguing that he was entitled to have been advised of the *Miranda* warnings. The defendant maintained that any statements made during the questioning were obtained in violation of those rights.

The trial court granted the motion and the appellate court affirmed. This court reversed the ruling on appeal. (*Patterson*, 146 Ill. 2d at 458-59.) In reaching its conclusion, this court employed a two-tiered analysis: first, this court considered whether the defendant's interrogation was custodial (*Patterson*, 146 Ill. 2d at 454) and, second, whether the defendant was subjected to interrogation while in custody (*Patterson*, 146 Ill. 2d at 456). Among the factors considered in determining whether an interrogation is custodial were "the location, length, mood and mode of the interrogation; the number of police officers present; any evidence of restraint; and the intentions of the officers and focus of their investigation." (*Patterson*, 146 Ill. 2d at 454.) Interrogation, on the other hand, is evidenced not only by express words but by any words or actions on the part of the police officers "that they should know are reasonably likely to elicit an incriminating response." (*Patterson*, 146 Ill. 2d at 456.) With these same considerations in mind, we look to the circumstances of the second interrogation conducted on September 3.

"[R]estriction, with regard to a person's liberty, is a relative concept, one not determined exclusively by the

lack of freedom to leave." (*Patterson*, 146 Ill. 2d at 461 (Freeman, J., dissenting); see also *Cervantes v. Walker* (9th Cir. 1978), 589 F.2d 424, 428.) Although an inmate's freedom is curtailed by virtue of his confinement in prison, the handcuffs on defendant during the second interrogation placed a greater burden on his freedom than that typically imposed upon him as an inmate. (See *Patterson*, 146 Ill. 2d at 455.) An additional imposition had been added to defendant's freedom, beyond those he lived with in the prison environment, and he was obviously not free to leave the interrogation. He remained in handcuffs throughout the entire interrogation and was neither physically capable of leaving the office nor permitted to leave until the officers had completed questioning him, both of which circumstances support a finding that defendant was in custody. Even the reading of the *Miranda* warnings indicated that defendant was in custody. (See *People v. Townes* (1982), 91 Ill. 2d 32, 37.) Moreover, unlike the defendant in *Patterson*, defendant was not in segregation at the time of the interview, so his freedom of movement was not *increased* as a result of the interview. (See *Patterson*, 146 Ill. 2d at 455.) Taking into consideration this evidence as well as the evidence of the conditions under which defendant was questioned, we conclude that defendant was in custody during the second round of questioning conducted by the Department.

We also conclude that defendant was interrogated and therefore entitled to the *Miranda* warnings. Defendant was interrogated by two investigators, not a prison warden or counselor. (See *Patterson*, 146 Ill. 2d at 461 (Freeman, J., dissenting).) Defendant was obviously the focus of the Department's energies and was questioned with the intention of eliciting evidence to assist in the Department's investigation and ultimate prosecution for Taylor's murder. Unlike the defendant in *Patterson*, nei-

ther party maintains that the investigator's questions were "related to defendant's needs." (See *Patterson*, 146 Ill. 2d at 457.) In *Patterson*, the defendant conceded that the investigator's questions were ostensibly for his benefit. (See *Patterson*, 146 Ill. 2d at 457 (interview was an attempt to learn if the defendant needed protection from other inmates and to ascertain any trial strategies).) There is no such contention by either party in this case.

Defendant was the subject of intense scrutiny by the investigators. At the suppression hearing, Read testified that he told defendant that he was considered a prime suspect during the second interrogation and Long also indicated the same to defendant in the statement he made to him during the questioning ("[I] advised him that we had inmate testimony that indicates that he and another individual were the hitters or perpetrators of the murder of Superintendent Taylor"). In fact, defendant as well as the original 30 inmates interrogated were considered suspects in Taylor's murder when the interrogations began. We, therefore, find that defendant was a rightful beneficiary of the *Miranda* warnings during the second round of questioning on September 3.

Once defendant had been advised of his *Miranda* rights, he invoked his right to remain silent. Both Read and Brubaker testified at the suppression hearing that defendant refused to speak to them. Yet, after these refusals, Long obtained defendant's statement.

In *Michigan v. Mosley* (1975), 423 U.S. 96, 104, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326, the United States Supreme Court stated that "the admissibility of statements after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" The factors the Court considered in determining that the defendant's invocation of the right to remain silent had

been honored included whether a significant amount of time had elapsed between interrogations; whether the subsequent interrogation was by a different officer; whether the subsequent interrogation was prefaced by a fresh set of *Miranda* warnings; and whether the interrogation involved a matter unrelated to the subject of the first interrogation. *Mosley*, 423 U.S. 96, 46 L. Ed. 2d 113, 96 S. Ct. 321.

This court considered the same issue in *People v. R.C.* (1985), 108 Ill. 2d 349. In *R.C.*, a 15-year-old minor was arrested in connection with a burglary. After being informed of his *Miranda* rights, the defendant indicated that he did not want to speak to the police. At that point, one of the interrogating officers replied that the defendant had that right, but that he had been identified by an accomplice in the burglary and the arresting officer, which in fact had occurred. The officer then asked the defendant about the items taken in the burglary and the defendant made a confession implicating himself in the crime.

In concluding that the defendant's right to remain silent had not been " 'scrupulously honored,' " this court stated in *R.C.*:

> "Under [the *Mosley*] test, it is clear that [the defendant's] right to remain silent was not 'scrupulously honored'; in fact, it was not honored at all. Both the interrogating officer and [the defendant] testified that after he had been read his *Miranda* warnings, [the defendant] stated that he did not wish to talk to the officer. Rather than terminating the interrogation immediately, which is what *Miranda* requires, *the officer told the defendant that he had been identified.* This was an obvious effort to persuade [the defendant] to make a statement." (Emphasis added.) (*R.C.*, 108 Ill. 2d at 354.)

In the case at bar, we believe, contrary to the trial court's conclusion, that Long's statement was made in

an "obvious effort to persuade [the defendant] to make a statement." (*R.C.*, 108 Ill. 2d at 354.) After being informed that defendant chose not to speak with the officers, Long immediately spoke to defendant and not only told him that *he had been identified* as one of the murderers, but that if convicted of the crime, he was *subject to being put to death*. Clearly, these statements were not made in an effort to calm or reassure defendant. While it was not Long's duty to counsel defendant, he was required to honor defendant's constitutional right to remain silent. Honoring that right includes the obligation to refrain from making statements that are nothing more than thinly veiled "effort[s] to persuade" a defendant in custody to make a statement. See *R.C.*, 108 Ill. 2d at 354.

As we noted above, both the Supreme Court's opinion in *Mosley* and this court's opinion in *R.C.* state that Long's statement is not the only factor to consider in determining whether defendant's right to remain silent was scrupulously honored. In fact, in *R.C.*, even after concluding that the officer's statement to R.C. was an "effort to persuade [R.C.] to confess" (*R.C.*, 108 Ill. 2d at 354), this court looked to the other circumstances surrounding R.C.'s confession and determined that R.C.'s right to remain silent had *not* been honored. Therefore, in this matter, we too shall examine the circumstances surrounding defendant's statement.

In support of the conclusion that the right was honored is the finding that the officer who gave defendant his *Miranda* warnings immediately stopped questioning defendant; the subsequent statement to defendant was made by a different officer than the one who had given him the *Miranda* warnings. Additionally, unlike the defendant in *R.C.*, defendant was not explicitly questioned by Long after he made his statement to defendant. *Cf. R.C.*, 108 Ill. 2d at 354 (where "immediately"

after officer's efforts to persuade R.C. to confess, officer asked R.C. about the jewelry he had taken in the burglary).

The amount of time that elapsed between the point at which defendant was read his *Miranda* warnings and Long's statement to defendant is unclear; both Read and Long testified that Long entered the office "after" defendant had been read his *Miranda* warnings. We are unable to determine from the evidence before us whether the time that elapsed was "sufficient" to have honored defendant's right to remain silent. *Mosley*, 423 U.S. at 104-05, 46 L. Ed. 2d at 321-22, 96 S. Ct. at 326-27; *R.C.*, 108 Ill. 2d at 355.

Long never explicitly questioned defendant; therefore, he never gave defendant a fresh set of *Miranda* warnings before speaking to him. He never asked defendant questions about the murder, although the substance of his statement to defendant concerned Taylor's death.

While we conclude that the propriety of Long's statement is questionable, we do not believe that it rises to the level of being the "functional equivalent" of interrogation. (*Rhode Island v. Innis* (1980), 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682.) Moreover, in light of the factors surrounding defendant's statement, we conclude that his right to remain silent was scrupulously honored. We therefore find that defendant's statement was admissible at trial and, accordingly, we affirm the trial court's ruling allowing the statement into evidence.

Defendant next appeals the trial court's ruling on a third statement he sought to suppress in his pretrial motion. The statement was made by defendant during a conversation between Harry Martin, an inmate who was working undercover for the Department, and defendant. Conversations between defendant and Martin were recorded by means of an eavesdropping device Martin was

wearing. In his pretrial motion, defendant sought to suppress the eavesdropping tapes.

Defendant appeals the trial court's ruling allowing a statement he made to Martin to be used for impeachment purposes if defendant testified. Specifically, defendant argues that because the statement to Martin was (1) involuntary and (2) obtained in violation of the sixth and fourteenth amendments, it could not be used for impeachment. Further, defendant argues that "because the trial court ruled that [defendant's] statement could be used to impeach him, [defendant] did not testify." Defendant argues that the trial court's ruling violated the fifth, sixth and fourteenth amendments. For the following reasons, we find that defendant's statement was involuntary in violation of the due process clause of the fourteenth amendment and affirm the trial court's ruling suppressing the statement. However, we conclude that even if it were error to allow the use of the statement for impeachment purposes, the error was harmless beyond reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *Howard*, 147 Ill. 2d at 148.

On September 25, 1987, the trial court granted the State's motion for an order authorizing the use of an eavesdropping device from October 2, 1987, to October 12, 1987, for the purposes of recording conversations between Martin and, among others, defendant. It was arranged by the Department that Martin would attempt to gather information from defendant and from others who were suspected of murdering Taylor.

At some point after the second interrogation on September 3, 1987, and before Martin spoke with him (the record is unclear as to the exact date), defendant was placed on death row under "investigative status" by the Department in connection with its investigation into Taylor's murder. Some of the conditions of defendant's sta-

tus included segregation from the general prison popula-
tion, solitary confinement for 24 hours a day, escorts
from segregation under guard and in hand and leg cuffs,
and cessation of access to a telephone.

Evidence in the record reveals that Martin and
defendant were members of the same gang, the Black
Gangster Disciples, and that Martin had been an inmate
at Pontiac during the time defendant was incarcerated.
Martin contacted defendant as well as two other inmates
and requested that they place Martin's name on their
visitor's list. Martin, who represented to the inmates
that he had been released on an appeal bond, visited the
three inmates on separate occasions at Pontiac. Without
giving any of the inmates *Miranda* warnings before
speaking to them, Martin questioned them about Taylor's
death.

During a conversation between defendant and Martin
in the prison visiting area, Martin told defendant:

> "Now the other thing is we got you all some lawyers, but
> we ain't gonna bring them in yet. We got [attorney] Shel
> Bannister cause we don't want to make it seem like you
> all are admitting guilt. You know, you bring lawyers in
> before you have been indicted, you are like saying I did
> something. So we gonna bring them in later. *But what I
> need for Shel is some information insofar as is there any-
> body that saw the shit?*" (Emphasis added.)

In response to Martin's question, defendant told him
that he had filed a grievance with respect to the treat-
ment he had been receiving since he had been placed in
segregation. The following exchange then took place:

> "Martin: Okay, it don't matter up front. They don't
> care nothing about that, no way. Uh, who else was on this
> with you cause I'm gonna need to see him and make sure
> that he's straight."

Defendant then made a statement implicating himself in
Taylor's murder.

In a ruling issued on February 17, 1989, the trial court ordered that, in light of the recent opinion in *People v. Perkins* (1988), 176 Ill. App. 3d 443, defendant's statement to Martin was taken in violation of his fifth amendment rights and must therefore be suppressed. After the trial court's ruling, defendant filed a supplemental memorandum in support of the motion to suppress requesting the court to consider whether defendant's fourth and sixth amendment rights had also been violated. On April 4, 1989, after hearing arguments by both parties, the trial court expanded its earlier ruling on the motion and held that no fourth amendment violation had occurred as there was no expectation of privacy in a conversation occurring in a crowded prison visiting area. Additionally, the trial court made a number of observations with regard to whether defendant's sixth amendment rights had been violated, some of which follow:

"[W]e have the sixth amendment problems when we talk about the lawyers. There is no question that what transpired was an interrogation by Martin. This is a case where Martin kept everything moving. Everytime the defendant tried to digress, Martin put him right back on why Martin was there. 'What happened, who saw what?' Easley wasn't allowed to digress. So as to the sixth amendment issue, the most recent case I could find that is somewhat analogous, although there are some state cases, is *U.S. v. Bobby Seale* [(7th Cir. 1972), 461 F.2d 345].

\* \* \*

The state is precluded in using that statement in their case in chief. I am not saying the state is precluded from using that shielded communication, shielded under the circumstances I have ruled on, for all purposes. I don't know."

The court left unresolved the question of whether the State would be allowed to introduce the statement during cross-examination of defendant, but reserved final

ruling on the motion to a later date. Then, on May 23, 1989, in its final ruling on the motion, the court stated the following:

> "[I]n a situation where a defendant is duped into believing the person he is talking to is an emissary from an attorney, privilege still applies and the limited privilege the state can't use it in their case in chief, and if I say it is limited, the state is not precluded from using it for a limited purpose if the defendant testifies during cross examination."

Although defendant did not testify, the constitutional issues he raises are properly presented to this court. It is clear that although the trial court was concerned with making rulings in advance of the underlying issues being raised, it did in fact rule on the merits of the constitutional issues defendant raises. See *New Jersey v. Portash* (1979), 440 U.S. 450, 454, 59 L. Ed. 2d 501, 507, 99 S. Ct. 1292, 1294-95; *Brooks v. Tennessee* (1972), 406 U.S. 605, 32 L. Ed. 2d 358, 92 S. Ct. 1891.

And, while the Supreme Court has held that to raise the claim of improper impeachment with a prior conviction, a defendant must testify (*Luce v. United States* (1984), 469 U.S. 38, 83 L. Ed. 2d 443, 105 S. Ct. 460), the Court declined to review the errors defendant raised on the basis of the special requirements of Rule 609(a) of the Federal Rules of Evidence. Justice Brennan, in a concurrence joined by Justice Marshall, wrote that in cases "in which the determinative question turns on *legal* and not *factual* considerations, a requirement that the defendant actually testify at trial to preserve the admissibility issue for appeal might not necessarily be appropriate." (Emphasis added.) *Luce*, 469 U.S. at 44, 83 L. Ed. 2d at 449, 105 S. Ct. at 464 (Brennan, J., concurring, joined by Marshall, J.).

The trial court suppressed defendant's statements to Martin, properly relying on the recent appellate court

opinion in *People v. Perkins* (1988), 176 Ill. App. 3d 443. Specifically, the trial court found that Martin was an agent of the State and that "under *People v. Perkins*, [Martin] was required to apprise the defendants in this case of their [fifth amendment] rights."

In *Perkins*, police placed an undercover agent posing as an inmate in the defendant's cell. During his initial conversation with the defendant, the agent suggested that the two of them and another inmate escape from the prison. Later that evening, the defendant said that his girlfriend could smuggle in a pistol to be used in their escape. The agent then asked the defendant if he had ever " 'done' " anybody, at which point the defendant told the agent of a murder he had committed in East St. Louis. The defendant did not receive *Miranda* warnings from the agent before making his statements. The defendant was then charged with murder. Before his trial on the murder charges, the defendant moved to suppress his statements to the agent, which motion was granted. The appellate court affirmed the trial court's ruling.

In an opinion filed subsequent to defendant's trial, the United States Supreme Court reversed the decision in *Perkins*. (*Illinois v. Perkins* (1990), 496 U.S. 292, 110 L. Ed. 2d 243, 110 S. Ct. 2394.) The Court observed that because the concerns implicated by *Miranda* are "not present when an incarcerated person speaks freely to someone that he believes to be a fellow inmate" (*Perkins*, 496 U.S. at 296, 110 L. Ed. 2d at 251, 110 S. Ct. at 2397), the defendant's statements to the undercover agent were voluntary and admissible. The Court said that "[i]n recounting the details of the *** murder, [the defendant] was motivated solely by the desire to impress his fellow inmates. He spoke at his own peril." (*Perkins*, 496 U.S. at 298, 110 L. Ed. 2d at 252, 110 S. Ct. at 2398.) Accordingly, the Court held that an undercover

law enforcement officer posing as a fellow inmate need not give *Miranda* warnings.

In light of the Court's opinion in *Perkins*, Martin was under no obligation to give defendant *Miranda* warnings before asking him questions about the Taylor murder. However, still left unanswered is the question of the constitutional voluntariness of defendant's statements. (See *Perkins*, 496 U.S. at 303, 110 L. Ed. 2d at 255, 110 S. Ct. at 2400-01 (Brennan, J., concurring) ("It is open to the lower court on remand to determine whether, under the totality of the circumstances, respondent's confession was elicited in a manner that violated the Due Process Clause").) Defendant argues that his statement was constitutionally involuntary in violation of the due process clause of the fourteenth amendment. The voluntariness of his statement depends on the absence of police overreaching. (*Colorado v. Connelly* (1986), 479 U.S. 157, 93 L. Ed. 2d 473, 107 S. Ct. 515.) Our inquiry, therefore, is confined to an analysis of Martin's conduct and whether that conduct was causally related to defendant's confession. (See *Connelly*, 479 U.S. at 163-64, 93 L. Ed. 2d at 482, 107 S. Ct. at 520.) We must decide whether, under the totality of circumstances, the challenged statement was obtained in a manner that comports with due process. *Connelly*, 479 U.S. at 163, 93 L. Ed. 2d at 482, 107 S. Ct. at 519-20; *Miller v. Fenton* (1985), 474 U.S. 104, 112, 88 L. Ed. 2d 405, 412, 106 S. Ct. 445, 450-51.

In *Colorado v. Connelly*, the United States Supreme Court considered the constitutional voluntariness of a statement made under circumstances not requiring *Miranda* warnings. *Connelly* involved a mentally ill defendant who confessed to a murder. He spontaneously confessed upon approaching a police officer in the street and then confessed two more times after being given *Miranda* warnings. The Supreme Court held that "coercive police activity is a necessary predicate to the finding

that a confession is not 'voluntary' within the meaning of the due process clause of the Fourteenth Amendment." (*Connelly*, 479 U.S. at 167, 93 L. Ed. 2d at 484, 107 S. Ct. at 522.) The Court rejected the respondent's argument that a defendant's mental condition, "by itself and apart from its relation to official coercion," should dispose of the inquiry into constitutional voluntariness. (*Connelly*, 479 U.S. at 164, 93 L. Ed. 2d at 482, 107 S. Ct. at 520.) "[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." (*Connelly*, 479 U.S. at 165, 93 L. Ed. 2d at 483, 107 S. Ct. at 520-21.) A voluntariness analysis under the fourteenth amendment must "focus[ ] upon the crucial element of police overreaching." *Connelly*, 479 U.S. at 163, 93 L. Ed. 2d at 482, 107 S. Ct. at 520.

An inquiry into the voluntariness of a statement under circumstances where *Miranda* is not required (such as the *Connelly* defendant's first confession and defendant's statement to Martin) is no different than an inquiry into the voluntariness of a waiver in the *Miranda* context; the sole concern in both settings is governmental coercion. (*Connelly*, 479 U.S. at 169-70, 93 L. Ed. 2d at 486, 107 S. Ct. at 523.) The difference in the two analyses, however, is that in order to be valid, a *Miranda* waiver must be shown to be voluntary *and knowing*.

> "Thus, from a Federal constitutional viewpoint, *only voluntariness*, rather than intelligent knowledge, ordinarily need be shown in the case of a confession *** that is given under circumstances not requiring a *Miranda* warning. But, where a defendant confesses after being given *Miranda* warnings ***, both *intelligent knowledge and voluntariness* remain requirements for assuring that a defendant's *Miranda* waiver reflects *Miranda*'s 'carefully drawn approach': its 'subtle balance' between the need for police questioning and the coercive pressures in-

herent in such questioning." (Emphasis added.) (*People v. Bernasco* (1990), 138 Ill. 2d 349, 357.)

As this court noted in *Bernasco*, this understanding of *Connelly* has been confirmed by later decisions, including the Court's opinion in *Perkins*. *Bernasco*, 138 Ill. 2d at 357 ("*cf. Illinois v. Perkins* (1990), 496 U.S. 292, 110 L. Ed. 2d 243, 110 S. Ct. 2394 (where murder confession was obtained deceptively by undercover 'cellmate' *prior* to any need for *Miranda* warning on murder charge, and thus no *Miranda* waiver question existed, sole self-incrimination issue was voluntariness in sense of absence of coercion")).

The due process clause of the fourteenth amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." (U.S. Const., amend. XIV.) The Supreme Court has held that by virtue of the clause, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton* (1985), 474 U.S. 104, 109, 88 L. Ed. 2d 405, 410, 106 S. Ct. 445, 449; see also *Connelly*, 479 U.S. at 163, 93 L. Ed. 2d at 481, 107 S. Ct. at 519. See, *e.g., Brown v. Mississippi* (1936), 297 U.S. 278, 80 L. Ed. 682, 56 S. Ct. 461 (Court set aside a conviction secured through means of brutal torture); *Mincey v. Arizona* (1978), 437 U.S. 385, 57 L. Ed. 2d 290, 98 S. Ct. 2408 (defendant subjected to four-hour interrogation while incarcerated and sedated in intensive care unit); *Haynes v. Washington* (1963), 373 U.S. 503, 10 L. Ed. 2d 513, 83 S. Ct. 1336; *Lynumn v. Illinois* (1963), 372 U.S. 528, 530-35, 9 L. Ed. 2d 922, 924-27, 83 S. Ct. 917, 918-21; *Spano v. New York* (1959), 360 U.S. 315, 319-20, 322-23, 3 L. Ed. 2d 1265, 1269, 1271-72, 79 S. Ct. 1202, 1205, 1206-07. See also *People v. Thomlison* (1948), 400 Ill. 555, 562-64; *People v. Santucci* (1940), 374 Ill. 395,

398-401 (where this court invalidated confessions obtained through physical assaults).

The Supreme Court has not considered whether the type of tactics used by Martin is sufficiently coercive to justify a conclusion that defendant's statement was involuntary. Although the Court's opinion in *Perkins* now apparently permits behavior by the government that would otherwise be impermissible outside a prison setting, this court is obligated to examine that conduct and determine whether, under the totality of circumstances, it comports with the due process clause.

Confinement in a prison presents a set of circumstances unique in obtaining information from a suspect. Inherent in this setting are factors which increase a suspect's anxiety; confiding in others is a likely form of relief for the suspect. (*Perkins*, 496 U.S. at 307, 110 L. Ed. 2d at 258, 110 S. Ct. at 2403 (Marshall, J., dissenting) (and authority cited therein).) Because the State has virtually complete control over the suspect's environment, the State is in a unique position to "exploit this vulnerability." (*Perkins*, 496 U.S. at 303, 110 L. Ed. 2d at 255, 110 S. Ct. at 2400 (Brennan, J., concurring).) The State can barrage a suspect with questions from an undercover agent until the suspect makes an inculpatory statement. (See *Perkins*, 496 U.S. 292, 110 L. Ed. 2d 243, 110 S. Ct. 2394.) We believe the record in this matter supports this conclusion.

The deception engaged in by Martin "play[s] on a suspect's need to confide in a trusted advisor." (*Perkins*, 496 U.S. at 309, 110 L. Ed. 2d at 259, 110 S. Ct. at 2404 (Marshall, J., dissenting).) Other than the relationships between a doctor and his patient, a clergy and a layman, or that between spouses, no relationship is accorded more privilege in the eyes of the law than the relationship between an attorney and his client. Only last term, this court held that an in-house counsel was not al-

lowed an action for retaliatory discharge against his former employer. (*Balla v. Gambro* (1991), 145 Ill. 2d 492.) Part of this court's support for denying the claim was bottomed on the nature of the relationship between an attorney and his client. In that opinion, we stated that " 'the relationship between an attorney and client is based on trust and that the client must have confidence in his attorney in order to ensure that the relationship will function properly.' " (*Balla*, 145 Ill. 2d at 503, quoting *Rhoades v. Norfolk & Western Ry. Co.* (1979), 78 Ill. 2d 217, 228.) Moreover, we quoted language from the Supreme Court's opinion in *Upjohn Co. v. United States* (1981), 449 U.S. 383, 389, 66 L. Ed. 2d 584, 591, 101 S. Ct. 677, 682, in support of our position. See *Balla*, 145 Ill. 2d at 503-04.

To allow the police or their agent to pose as a defendant's attorney or an individual appearing on behalf of the attorney raises serious concerns that defendant's will was overborne. The police conduct must be considered under the circumstances in which it was played out. We refer to the trial court's observations along these lines.

"I think we have to focus on the fact situation in the case *** [defendant] was interviewed concerning the murder, was told [he was] a prime suspect[ ], [was] immediately placed in segregation, behind what is called the steel door, held incommunicado, not allowed to have contact with anyone unless authorized by the administration. [He was] cut off. [He] was advised of his *Miranda* rights by prison investigators. [He] declined to discuss [his] involvement, if any, with the Taylor murder with the prison investigators. [He] refused to talk about anything. Refused to answer questions. Thus we have for a period of a month [defendant] separated not only from the general prison population but from everyone else, celled individually 24 hours a day, taken anywhere he went under escort, not allowed communication with outsiders. Then lo and behold, suddenly, [defendant] receive[s] a visit from a

person who claims to be and who generally has a high background of being a fairly high ranking gang member, Harry Martin. Mr. Martin *** asked to be put on the waiting list by Mr. Easley, and Mr. Easley did that, and Mr. Martin with a wire, *** goes to talk to Mr. Easley."

The trial court's observations of the circumstances of defendant's confession, although made in the context of a sixth amendment analysis, are apt. Martin was insistent; in those instances where Easley was not responsive to Martin's inquiries, Martin pulled defendant back to the subject of Martin's questions. As the trial court noted, "This is a case where Martin kept everything moving. Everytime the defendant tried to digress, Martin put him right back on why Martin was there. 'What happened, who saw what?' *Easley wasn't allowed to digress.*" Defendant was "barraged" with questions from an individual he was acquainted with both as a fellow inmate and a gang member. (*Perkins*, 496 U.S. 292, 110 L. Ed. 2d 243, 110 S. Ct. 2394.) He did not have the opportunity to confirm the circumstances under which Martin requested defendant speak to him, nor did defendant reasonably have cause to question Martin's visit.

Even had defendant wanted to confirm Martin's representations, he was unable to, and Martin knew defendant was unable to confirm his story. The difficulty in this case is whether defendant should have believed that Martin was there on behalf of a lawyer. We conclude that it was reasonable for defendant to believe Martin's story and, again, we refer to the trial court's observations for our analysis.

"Is there anyway Easley can check it out. Is there anyway he can sit there and say 'I don't know whether Martin is pulling my chain or what he is doing, and I think I will make a call. I am going to go and call Shel Bannister right now and make sure she is going to represent me and I don't want to say anything to Martin before I check it out.' Perhaps someone in different circumstances might

have been able to do that. Mr. Easley, however, is not in a situation where he can simply say 'wait a minute, let me make a couple of phone calls, I have to check this out.' Pontiac does not allow inmates in disciplinary segregation to make phone calls. *** So communication between Mr. Easley and the outside world is closely monitored. It is going to be extremely difficult, if not impossible, for him to try and verify what Martin has told him, which is that Shel Bannister is involved in the case."

Unlike the defendant in *Perkins*, defendant was not motivated "solely by the desire to impress his fellow inmates." (*Perkins*, 496 U.S. at 298, 110 L. Ed. 2d at 252, 110 S. Ct. at 2398.) The information, defendant was assured, was for the lawyer, "for Shel's information." Defendant was never led to believe that the information Martin sought was for Martin's use; defendant's confession was obtained with the assurance that it is "for Shel's information." Martin held himself out to defendant as speaking to him on behalf of his attorney that had been retained on his behalf. He told defendant that Shel Bannister had been retained, an attorney widely known for her work in defending prisoners.

We conclude that the ruse devised by the police to elicit defendant's statement was so incompatible with the guarantees of the due process clause and to a civilized system of justice to justify the conclusion that its further use must not be permitted. Therefore, we find that defendant's statement to Martin was involuntary in violation of the guarantees of the due process clause. Accordingly, its use at trial was impermissible.

The trial court suppressed the statement pursuant to the appellate court opinion in *People v. Perkins*. The basis for the suppression of the statement was the finding that defendant's fifth amendment rights had been violated. *People v. Perkins* has subsequently been reversed by the opinion in *Illinois v. Perkins*. Nevertheless, we

affirm the trial court's order suppressing defendant's statement to Martin. The trial court's ruling suppressing defendant's statement was correct, although the basis for its ruling was erroneous. The basis for our conclusion is that defendant's statement was obtained in violation of the due process clause of the fourteenth amendment.

We next consider defendant's argument with respect to the sixth amendment. Defendant's contention, that his statement to Martin was obtained in violation of the guarantees of the sixth amendment, is incorrect. Likewise, the trial court's ruling that defendant's sixth amendment rights had been violated was also erroneous.

The conversation between defendant and Martin occurred sometime between October 2, 1987, and October 12, 1987. Because defendant was not charged by indictment with Taylor's murder until October 16, 1987, there was no sixth amendment violation. See *Perkins*, 496 U.S. at 299, 110 L. Ed. 2d at 253, 110 S. Ct. at 2398-99; *United States v. Gouveia* (1984), 467 U.S. 180, 188-89, 81 L. Ed. 2d 146, 154-55, 104 S. Ct. 2292, 2297-98; see also *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877 (plurality opinion); see also *People v. Smith* (1991), 141 Ill. 2d 40.

The trial court allowed defendant's statement to be introduced for impeachment purposes in light of its finding that defendant's sixth amendment rights had been violated. The court relied on the seventh circuit opinion in *United States v. Seale* (7th Cir. 1972), 461 F.2d 345, 364, for this ruling. *Seale* is readily distinguishable from the present case in that at the time the covert surveillances were conducted, the defendant's sixth amendment rights had attached. As we noted above, the same is not true in this matter. We therefore conclude that the trial court's reliance on *Seale* was misplaced.

Moreover, reliance on *Seale*, even if appropriate, was unnecessary. Having suppressed the statement pursuant

to the opinion in *People v. Perkins* (1988), 176 Ill. App. 3d 443, which found that the defendant's fifth amendment rights had been violated, the State still may have used the confession for purposes of impeachment as a prior inconsistent statement of defendant. *United States v. Havens* (1980), 446 U.S. 620, 64 L. Ed. 2d 559, 100 S. Ct. 1912; *Harris v. New York* (1971), 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643; *People v. Byers* (1972), 50 Ill. 2d 210; M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 502.15, at 237-38 (4th ed. 1984).

We turn now to defendant's final argument on this issue. Defendant argues that because an involuntary statement may not be used for impeachment purposes (*Mincey v. Arizona* (1978), 437 U.S. 385, 401-02, 57 L. Ed. 2d 290, 306, 98 S. Ct. 2408, 2418-19), it would be "incongruous" to allow a statement obtained in violation of the due process clause to be used for impeachment purposes. Defendant maintains that as a result of the trial court's order allowing his statement to Martin to be used for impeachment purposes, he did not testify; the effect of the order was to chill the exercise of his constitutional right to testify on his own behalf. *Rock v. Arkansas* (1987), 483 U.S. 44, 51, 97 L. Ed. 2d 37, 46, 107 S. Ct. 2704, 2708-09.

The Supreme Court has not considered this issue and we too shall reserve a decision on this matter in light of our analysis under the harmless beyond a reasonable doubt standard accorded review of constitutional errors in a criminal trial. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *Howard*, 147 Ill. 2d at 148.) If this court were to accept defendant's argument and conclude that a statement obtained in violation of the due process clause could not be used for impeachment purposes, the next question for us would be whether this court could term "harmless beyond a reasonable doubt" an error that presumptively kept defend-

ant from testifying. Although an order, the effect of which is to impermissibly preclude a defendant from testifying on his own behalf, is a constitutional error, the error does not inevitably require that the defendant be granted a new trial. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *United States v. Hasting* (1983), 461 U.S. 499, 510-11, 76 L. Ed. 2d 96, 107, 103 S. Ct. 1974, 1981; *Howard*, 147 Ill. 2d at 148.

The evidence in support of defendant's guilt in this case is overwhelming. Two eyewitnesses testified that they saw defendant murder Taylor. One eyewitness was in the office with Taylor when he was murdered and the second eyewitness was immediately outside the office. Neither witnesses' account of the murder was shaken on cross-examination. There was also testimony from various correctional officers who placed defendant near or next to Taylor's office immediately before Taylor was murdered.

Defendant's fingerprint, and no other, was found on the weapon identified as that used to murder Taylor and a footprint identified as having been made by a gym shoe removed from defendant's cell was left in Taylor's office. Although there was no blood found on defendant or his clothing that was identified as being the same type as Taylor's, the circumstantial evidence supports the conclusion that defendant soaked the clothing he was wearing at the time of the murder to remove any blood. In these circumstances, we conclude that even if it were error to allow a statement obtained in violation of the due process clause to be used for impeachment purposes, the error in this case was harmless beyond a reasonable doubt.

Defendant next argues that his fifth amendment right against self-incrimination was denied where the State elicited from Long on direct examination the information that, rather than talk to investigators, defendant had in-

voked his right to remain silent after receiving the *Miranda* warnings. Defendant failed to object to the challenged testimony at trial and failed to identify the comment as error in his post-trial motion. (*People v. Young* (1989), 128 Ill. 2d 1, 38.) Defendant has waived review of this error; to succeed on the claim he must demonstrate plain error. *People v. Hayes* (1990), 139 Ill. 2d 89, 143.

Deputy Director Long testified in the State's case in chief that on the evening of September 3, 1987, he entered Warden Lowry's office, where defendant was being interrogated. The testimony defendant challenges follows:

> "Q. [Prosecutor]: And did you speak with [defendant] when you went in?
>
> A. [Long]: Yes, I did.
>
> Q. Can you tell us what you said?
>
> A. I asked [the investigators] if [defendant] had been apprised of his rights with respect to self-incrimination, that the investigator did apprise me that he had been apprised of his rights. With respect, those investigators were Mr. Read and Mr. Brubaker. *And they also indicated that he wished not to make any statement at that time.*
>
> *And I looked at defendant and I asked him if that is true, and he indicated in the affirmative, yes, that was true.* And I said, fine. I don't wish to ask you any questions. I just want to apprise you of the situation that you now find yourself in, to which I advised him that irregardless of what he had been involved in in the past, this was more serious and that it was involving a murder, with the potential for capital punishment." (Emphasis added.)

In *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, the Supreme Court held that it would be fundamentally unfair and a violation of due process to allow the prosecution to use for impeachment purposes a defendant's silence at the time of arrest and after receiv-

ing *Miranda* warnings. "Silence in the wake of [*Miranda*] warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus every post-arrest silence is insoluably ambiguous because of what the State is required to advise the person arrested." *Doyle*, 426 U.S. at 617, 49 L. Ed. 2d at 97, 96 S. Ct. at 2244.

We conclude that Long's testimony on defendant's post-*Miranda* silence was improper. Long's testimony revealed that defendant had twice invoked his right to remain silent: first when Read and Brubaker told Long that defendant had invoked his right to remain silent and then again when Long asked defendant if that were true and defendant nodded. The jury was therefore improperly told that defendant remained silent after he was read the *Miranda* rights.

Defendant asks us to consider the improper testimony under the plain error rule. The plain error rule, however, is not a general savings clause; it is invoked only in exceptional circumstances where the evidence is closely balanced or the alleged error was so prejudicial that it deprived defendant of a fair trial. (*People v. Hayes* (1990), 139 Ill. 2d 89, 143; 134 Ill. 2d R. 615(a).) Neither alternative is present in this matter.

Moreover, because defendant did not testify at trial, neither the fact of defendant's silence after receiving *Miranda* or Long's testimony were used to impeach defendant. No mention of the post-arrest silence was made by the prosecutor in his closing argument to the jury.

Defendant's next issue concerns gang evidence admitted at trial and discussed by the State in its closing argument to show the motive for Taylor's murder. Defendant argues that the evidence offered in support of this theory was improperly admitted at trial and arguments made by the State in closing argument were highly prej-

udicial. Defendant argues that the various evidentiary errors rendered his trial fundamentally unfair in violation of due process under the State and Federal Constitutions.

We agree with defendant and find that the gang-related evidence was improperly admitted at trial. We also find that the statements the State made during closing argument were improper. However, when considering the impact of the evidence on defendant's trial under all the attendant circumstances, we find that defendant was not denied a fair and impartial trial despite the erroneous admission of the evidence. Additionally, we find that the State's comments in closing, although inflammatory, did not amount to substantial prejudice.

In its opening statement to the jury, the State revealed its theory of the motive for Taylor's murder:

"The evidence will establish who is responsible in this case. We believe the evidence will show that in one important respect this case began in August of 1987 and I say that because an inmate died at the Pontiac Correctional Center in August.

This is important to this case because we believe the evidence will show that the inmate was a member of a gang called the Black Gangster Disciples and the Defendant in this case, Easley, and another defendant, Lucas, were also members of that gang and the importance of that event is this.

As a result of that, as a result of that death, the inmates basically blamed the guards at the correctional center and there were threats to the guards for a period of time afterwards and we believe the evidence will show that this culminated on September 3rd of 1987 with the death of Robert Taylor and we believe also that the reason that death occurred was that the Disciples organization or gang, whatever you want to call it, was paying back, so to speak at that and was seeking revenge against the administration.

They perceived that the administration had in effect killed one of theirs. The death of that inmate whose nickname was Zodiac, his name was Billy Jones, was caused by swallowing a bag full of controlled substance and he choked to death and again the inmates blamed that on the correctional staff."

According to testimony presented by the State, two inmates at Pontiac, Billy Jones and Curt Williams, were cellmates. On July 20, 1987, approximately two months prior to Taylor's murder, Jones and Williams were being transferred from their cells to segregation. Sergeant Danny Jarrett testified that prior to removing Williams from his cell to segregation, he overheard Williams say "that he [Williams] has 'tried to be a diplomat but these hookers just won't listen,' and he [Williams] is going to have to 'teach them a lesson.' "

While Williams and Jones were being moved, threats and catcalls were shouted by the other inmates who remained in their cells and watched the transfer. Jarrett testified at trial that the inmates were "yelling that somebody was going to get hurt and *** [t]hey were yelling [']one love,['] you know, [']cut one of us we all bleed[']; things like that."

Jarrett testified that in the process of being transferred, Jones "took a deep gasp and just fell over." CPR was administered, but Jones died. An autopsy performed on Jones revealed that his death was caused by an overdose from a bag of cocaine he had ingested that exploded. Jarrett testified that after Jones' death, the inmates said "they were going to retaliate because they observed the staff in the alleyway beating Billy Jones to death." Jarrett testified that these threats continued until August 20, 1987.

In *People v. Smith* (1990), 141 Ill. 2d 40, 56, this court stated the following:

"[M]otive is not an essential element of the crime of murder, and the State has no obligation to prove motive in order to sustain a conviction of murder. [Citations.] It is also well established, however, that any evidence which tends to show that an accused had a motive for killing the deceased is relevant because it renders more probable that the accused did kill the deceased. [Citations.] It is also the rule that in order for such evidence to be competent, it must, at least to a slight degree, tend to establish the existence of the motive relied upon or alleged. [Citations.] *Thus, when the State undertakes to prove facts which the State asserts constitute a motive for the crime charged, it must be shown that the accused knew of those facts.*" (Emphasis added.)

In its opening statement, the State argued that Taylor's murder was carried out by the Black Gangster Disciples (BGD) in retaliation for the death of Jones, a BGD member ("[W]e believe also that the reason that death occurred was that the Disciples organization or gang, whatever you want to call it, was paying back, so to speak at that and was seeking revenge against the administration"). In addition to Jones, the State remarked in its opening statement that "the Defendant in this case, Easley, and another defendant, Lucas, were also members of that gang." The State's theory was that Taylor's murder was revenge for the death of Jones and was carried out by defendant as a BGD member avenging the death of another BGD member. In order to prove this theory, the State introduced evidence of the existence of gangs at Pontiac and defendant's status as a BGD member throughout the course of the trial.

As was quoted above, "the State has no obligation to prove motive in order to sustain a conviction of murder." (*Smith*, 141 Ill. 2d at 56.) However, if the State chooses to prove motive in a murder and the motive the State undertakes to prove is conspiracy, "it must be shown that the accused knew of those facts" comprising

the conspiracy. (*Smith*, 141 Ill. 2d at 56.) In the case at bar, unless the State was able to prove that there was a BGD conspiracy to kill a correctional officer in retaliation for Jones' death and that defendant was aware of the conspiracy, the evidence relating to gangs was irrelevant and highly prejudicial. (See *Smith*, 141 Ill. 2d at 56; see also *People v. Wilson* (1987), 116 Ill. 2d 29, 52.) After reviewing the record, we conclude that, other than proving that Jones died and that defendant was a BGD member, the State failed to show these facts.

The flaws in the State's motive theory are manifest. The State's case was built almost entirely on Jarrett's testimony and supported with testimony from correctional officers at Pontiac as to their opinions on the existence of gangs at Pontiac and the membership of certain inmates. Early in Jarrett's testimony, defendant objected to the following line of questioning:

"Q. [Prosecutor]: Now can you describe to the jurors what happened when the effort was made to move [Jones and Williams]?

A. [Jarrett]: They started, Curt Williams started speaking and ah, started the gallery going off the front of [gallery] Five and front of [gallery] Seven. He made the statement, something to the effect, that—

Q. [Defendant]: Objection, Judge. This is what—

THE COURT: Just stay there.

Q. [Defendant]: I want a side bar ***.

THE COURT: Okay."

In arguments before the court on the objection, defendant argued that the statement was hearsay, while the State argued that the statement Williams made which Jarrett was going to testify to was admissible to show the effect the statement had on the guards, not for the truth of the statement. In ruling on the hearsay objection, the trial court made the following statement:

"The State's case, I believe is predicated, *** on the fact that the Black Gangster Disciples felt that a member

of that organization had been murdered by correctional officers, namely Billy [Jones] or, Zodiac. He is a cellmate of Curt Williams. And that the death of Taylor, in the State's mind, and they believe their case is, that it was retaliation by the gang for that against a correctional officer.

Now the difficulty of showing that ah, is obvious. The correctional officers are not invited to gang meetings.

Gang meetings take place surreptitiously, motives and plans and plots are hatched quitely [sic] as to an event which evolved, or there was present, Zodiac or Billy Jones.

If the State feels that that is tied in, that this, in fact, was one of the precipitating events some month and a half before the death of Taylor, ah, and that an inmate, by the name of Curt Williams, made some kind of a speech to incite other gang members or residents on that gallery to do something, than [sic] I understand the objection. It is clear. But I will overrule the objection ***."

The trial court allowed the statement in, but instructed the jury that the State wanted to use the testimony to show a series of events and organizations causing Taylor's death, not that what Williams said was true.

As the trial court observed, the difficulty in proving the facts in support of the State's motive for Taylor's murder lies in the nature of a conspiracy. However, it is not the fact that "correctional officers are not invited to gang meetings" which made the State's task more difficult; the correctional officers' participation in or knowledge of the conspiracy is not significant when considering defendant's motive for murdering Taylor. It is *defendant's* participation in and knowledge of the conspiracy that is relevant and it was the State's failure to show that *defendant* "had been invited to gang meetings" which rendered admission of the gang evidence erroneous.

As was noted above, a majority of the evidence in support of the State's theory was elicited from various

correctional officers, all of whom testified that in their opinion, defendant was a BGD member. Regardless of whether the officers' opinions were correct, the repeated identification of defendant as such does not establish the fact that the BGD were engaged in a conspiracy to avenge Jones' death by murdering Taylor. One of the testifying officers stated that seven gangs operated in the south cellhouse and that only 10 to 15 inmates in the south cellhouse did not belong to a gang. The relevance of this testimony to defendant's guilt or innocence or even in furtherance of the State's motive theory escapes us, but it was evidence of this nature that was repeatedly presented to the jury in the name of proving the State's motive.

The State failed to introduce any evidence that any meetings had taken place where BGD members had discussed murdering a member of the Pontiac staff in retaliation for Jones' death. More significantly, however, the State failed to show that defendant had been present at any of these meetings, if the meetings in fact occurred, and that he was aware of the conspiracy. It is essential that "when the State undertakes to prove facts which the State asserts constitute a motive for the crime charged, it must be shown that the accused knew of those facts." (*Smith*, 141 Ill. 2d at 56.) Jarrett's testimony that the inmates said "they were going to retaliate because they observed the staff in the alleyway beating Billy Jones to death" was not linked to any particular inmate, let alone a BGD or defendant, and was woefully insufficient to allow introduction of the gang evidence at trial in support of the State's theory.

The State presented evidence in the form of testimony from Long in support of its motive theory. Long testified on redirect examination that his knowledge that defendant was a BGD "played a very significant role in the [Department's] investigation and in the murder."

Long also testified that the investigation did not reveal any involvement by the Vice Lords or the Stones, two other gangs, in Taylor's murder. Long did not testify as to how he became aware that defendant was a BGD or offer any evidence in support of this statement. Nevertheless, accepting the veracity of Long's testimony, defendant's status as a BGD failed to establish that Taylor's murder was gang-related and that defendant was involved in a conspiracy to murder Taylor. The State failed to tie the "evidence" of gang activity at Pontiac to its motive for Taylor's death. The evidence failed to establish the crime with which defendant was charged was gang-related and, as such, should not have been admitted. "[T]he inflammatory evidence of gang-related activity offered to support the 'motive' theory was of little probative value and could do little more than 'excite a suspicion of guilt' in the minds of the jurors. [Citation.]" *Smith*, 141 Ill. 2d at 59.

The erroneous admission at trial of the gang evidence does not automatically warrant reversal. (See *Smith*, 141 Ill. 2d at 79 (conviction reversed in light of cumulative errors).) The effect of inflammatory evidence depends upon the circumstances of the case. (*People v. Gacy* (1984), 103 Ill. 2d 1, 86.) In this matter, with the introduction of the evidence, the jury was offered a reason as to why the murder occurred; without the evidence, the motivation was speculative. Regardless, though, of whether the case had been submitted to the jury with or without the gang evidence, the jury would still have been presented with the testimony of the eyewitnesses to the murder as well as the physical evidence in support of the State's case against defendant. Accordingly, we hold that defendant was not denied his right to a fair and impartial trial by the introduction of the gang evidence.

We now consider whether the State's comments on the gang evidence in closing argument denied defendant

a fair trial. The State failed to link to defendant the statement Jarrett overheard Williams make (Jarrett testified that he heard Williams say that "he [Williams] has 'tried to be a diplomat but these hookers [guards] just won't listen,' and he [Williams] is going to have to 'teach them a lesson' "). Moreover, this statement was made *prior* to Jones' death and was in no way consistent with the State's theory that Taylor's murder was in *retaliation* for Jones' death. This statement was admitted over defendant's hearsay objection, as we observed above, which we now hold was improperly admitted.

The problem of the erroneous admission of this evidence was exacerbated by the prosecutor's argument to the jury. In closing, the State abandoned the position that Williams' statement was admitted simply for the purpose of showing its effects on the guards. Instead, the prosecutor stated that Williams said that the guards would have to be taught a lesson and then argued that the lesson was the murder of Taylor:

> "[Jones] died about an hour after that. What did Jarrett tell you happened then? The entire cellhouse for the rest of the time there that he was in there, there were threats to guards. What are those threats? I'm not going to eat my food? What threats is he talking about?
>
> Black Gangster Disciple threats. That's what he's talking about. He [defense counsel] didn't tell you that part of it. He only talked about right before the murder of [Jones]. He wouldn't finish it up, explain why there was a reason for the Gangster Disciples to go after a guard or guards or members of the administration."

The State used this statement, admitted for the purpose of showing its effect on the guards, to establish that Taylor's death was the very lesson about which Williams warned. This was improper. Even had the State refrained from arguing the substance of this statement,

the fact the guards may have been frightened has no relevance to the guilt or innocence of defendant.

In its closing argument, the State also used Jarrett's testimony that the inmates said that "they were going to retaliate because they observed the staff in the alleyway beating Billy Jones to death" as evidence of BGD threats to the guards ("What did Jarrett tell you happened then? The entire cellhouse for the rest of the time that he was in there, there were threats to guards. What are those threats? *** Black Gangster Disciple threats"). Jarrett's testimony was not linked to defendant or the BGD, yet the State argued as much in its closing argument.

The State argued extensively in its closing argument its theory of the gang-related motive.

> "It is true that the State is permitted wide latitude in closing argument and may argue to the jury facts and legitimate inferences drawn from the evidence. [Citations.] It is, however, improper for the prosecutor to argue assumptions or facts not based upon evidence in the case or to present to the jury what amounts to his own testimony. [Citations.] Furthermore, it is improper for the prosecutor to do or say anything in argument the only effect of which will be to inflame the passion or arouse the prejudice of the jury against the defendant, without throwing any light on the question for decision. [Citation.] Improper remarks will not merit reversal unless they result in substantial prejudice to the defendant, considering the context of the language used, its relationship to the evidence, and its effect on the defendant's rights to a fair and impartial trial. [Citations.]" (*Smith*, 141 Ill. 2d at 60-61.)

The remarks by the prosecutor, while improper, do not amount to substantial prejudice. After reviewing the overwhelming evidence in support of defendant's guilt, we conclude that the language used by the State in closing, although inflammatory, did not so prejudice the jury

as to deny defendant a fair trial or have a disproportionate impact on the jury's finding of guilt.

Defendant next argues that he was denied a fair trial by the State's introduction of victim impact testimony during the guilt stage of his trial, which argument we reject.

The State's first witness was Taylor's wife. She testified that the last time she saw Taylor was on September 2, the day before his murder. Mrs. Taylor testified that she spent the evening of September 2 at her mother's home and did not see her husband on September 3 before he left for work. On September 3, at approximately 12 a.m., she was contacted and notified to come to the hospital at Pontiac where she identified her husband's body.

The following testimony was elicited from Mrs. Taylor on direct examination:

"Q. [Prosecutor]: Mrs. Taylor, how many children do you have?

A. [Mrs. Taylor]: Four.

Q. And do they live with you in Pontiac?

A. Well the older ones were in school and the youngest boy lived with his mother.

Q. How old was Mr. Taylor?

A. 42."

The State opened its rebuttal argument with the statements "Mr. Taylor was a living breathing human being. He had a wife and kids." No objection was made to Mrs. Taylor's testimony or to the State's comments in rebuttal.

This court has repeatedly condemned references by the prosecution to the surviving family of the deceased in murder cases. (See, *e.g., People v. Wilson* (1972), 51 Ill. 2d 302, 307; *People v. Jordan* (1967), 38 Ill. 2d 83, 92; *People v. Golson* (1965), 32 Ill. 2d 398; *People v. Bernette* (1964), 30 Ill. 2d 359, 371; *People v. Brown*

(1964), 30 Ill. 2d 297, 303.) This court stated in *Bernette* that the defendant's guilt must be established by legal and competent evidence, uninfluenced by bias or prejudice raised by irrelevant evidence, and where evidence that the deceased has left a spouse and family is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial and constitutes reversible error unless an objection thereto is sustained and the jury instructed to disregard such evidence. *Bernette*, 30 Ill. 2d 359.

Since *Bernette*, we have held that not every mention of defendant's family "*ipso facto* entitle[s] the defendant to a new trial, since in certain instances, dependent upon the facts, such a statement can be harmless." (*Jordan*, 38 Ill. 2d at 92.) In *Jordan*, the testimony regarding the victim's family occurred on redirect examination and consisted only of two answers, one indicating that the victim was married and the other indicating that the victim had one son. (*Jordan*, 38 Ill. 2d at 90.) In his final argument, the prosecutor stated that "[the victim] is just as loved by his loved one as any great figure in this country, and murder is murder." *Jordan*, 38 Ill. 2d at 91.

Conversely, in *Bernette*, rather than simply make the jury aware of the victim's family, the prosecutor dwelt upon and embellished this fact in a way that inferred this circumstance affected defendant's culpability. (See *Bernette*, 30 Ill. 2d 359.) Moreover, the jury in *Bernette* was reminded of the victim's homelife in an inflammatory closing argument by the prosecutor which was a calculated appeal to the juror's emotions rather than to the evidence in support of the defendant's guilt. See *Jordan*, 38 Ill. 2d at 92. See also *People v. Dukes* (1957), 12 Ill. 2d 334.

In the instant case, we do not consider desirable the line of questioning put to Mrs. Taylor regarding

her surviving children, nor do we condone the State's observations in rebuttal that Taylor "had a wife and kids." Nevertheless, we do not believe defendant was denied a fair trial as a result of the argument or as a result of Mrs. Taylor's testimony. We do not believe that Mrs. Taylor's testimony resulted in any prejudice to defendant and that under these circumstances, Mrs. Taylor's testimony was harmless. (See *People v. Del Vecchio* (1989), 129 Ill. 2d 265.) Mrs. Taylor did not see her husband on the day of his death other than to identify his body; therefore, her credibility as a "life and death witness" was diminished as her ability to identify her husband as a living person in good health prior to his departure for work on the day he was murdered did not exist. (See *People v. Free* (1983), 94 Ill. 2d 378.) Her testimony regarding her children was somewhat ambiguous. Mrs. Taylor testified that "the youngest boy lived with *his* mother," appearing to mean that the child lived with someone other than Mrs. Taylor; Taylor's relation to this child was uncertain. Clearly, this testimony does not support defendant's contention that Mrs. Taylor's testimony was elicited for its prejudicial value or even that the complained-of testimony had such an impact. *People v. Thompkins* (1988), 121 Ill. 2d 401, 447.

Moreover, the State's comment in rebuttal was so fleeting that we cannot find that it resulted in any prejudice to defendant. It was not by any means a significant portion of the State's argument and no effort was made by the State to correlate defendant's punishment to the ill-effects suffered by Mrs. Taylor or the children. (See *Bernette*, 30 Ill. 2d at 372.) Accordingly, we reject defendant's argument on this issue and find that he was not denied a fair trial as a result of either Mrs. Taylor's testimony or the State's comments in rebuttal.

Defendant next argues that the State used improper cross-examination techniques with two of his witnesses and that the improper impeachment rendered his trial fundamentally unfair in violation of the Federal and State guarantees of due process. Defendant failed to object to the cross-examination at trial. The failure to raise a contemporaneous objection waives an issue for review on appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Defendant also waived his objections to the cross-examination because he did not include the objections in his post-trial motion for a new trial. (*Enoch*, 122 Ill. 2d at 186.) As we observed above, plain error is inapplicable to invoke a review of this alleged error.

The next issue defendant raises is with regard to the jury instructions given for the first degree murder counts. Defendant claims that as a result of the wording in the oral and written issues instructions given to the jury, he was improperly found guilty of first degree murder. We agree that the wording in the instructions improperly stated defendant's burden of proof, but find that this error was harmless in light of our conclusion that defendant suffered no prejudice as a result. *People v. Tiggs* (1976), 38 Ill. App. 3d 72.

The murder issues instructions were in the following form:

"To sustain the charge of first degree murder the State must prove the following propositions:

First: that the defendant performed the acts which caused the death of Robert L. Taylor; and

Second: that when the defendant did so he intended to kill Robert L. Taylor.

If you find from your consideration of all of the evidence that *these* propositions have been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that *these* propositions have not been proved be-

yond a reasonable doubt, you should find the defendant not guilty." (Emphasis added.)

The Illinois Pattern Jury Instructions, Criminal, for voluntary murder are as follows:

"If you find from your consideration of all the evidence that *each of these* propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that *any one of these* propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." (Emphasis added.) Illinois Pattern Jury Instructions, Criminal, No. 7.06 (2d ed. 1968) (hereafter IPI Criminal 2d).

Defendant did not object to the instructions at the time they were given, nor did he raise the issue in his post-trial motion. It is well established that the failure to object at trial to an asserted error in jury instructions waives the question. (*People v. Huckstead* (1982), 91 Ill. 2d 536, 543; *People v. Tannenbaum* (1980), 82 Ill. 2d 177, 180.) Equally well-established is the rule that issues not raised in a post-trial motion are waived for purposes of review on appeal. (*Huckstead*, 91 Ill. 2d at 543; *Tannenbaum*, 82 Ill. 2d at 180.) However, "substantial defects are not waived by failure to make timely objections thereto if the interests of justice require." 134 Ill. 2d R. 451(c).

This court has consistently emphasized the limited nature of the plain error exception created by Rule 451(c). (*People v. Huckstead* (1982), 91 Ill. 2d 536, 544; *People v. Roberts* (1979), 75 Ill. 2d 1, 14-15; *People v. Underwood* (1978), 72 Ill. 2d 124, 129-30.) The exception is restricted to the correction of "grave errors" (*People v. Tannenbaum* (1980), 82 Ill. 2d 177, 182; *People v. Jenkins* (1977), 69 Ill. 2d 61, 66) or to situations where the case is close factually and fundamental fair-

ness requires that the jury be properly instructed. Although this court has never addressed the precise issue presented in this appeal, we conclude that an error in jury instructions which misstates the burden of proof in a capital sentencing hearing is a sufficiently "grave error" to warrant our review.

In the instant case, the oral issues instructions read to the jury and the written ones tendered to it were identical. Both sets of instructions differed from the IPI Criminal 2d instructions in the same manner, *viz.*, the instructions informed the jury that if it found that *"these propositions"* were proved beyond a reasonable doubt, it should find defendant guilty, and if it found that *"these propositions"* were not proved beyond a reasonable doubt, it should find defendant not guilty. "These propositions" were that defendant performed the acts that killed Taylor and that defendant intended to kill Taylor when he performed the acts.

Conversely, the IPI Criminal 2d instructions instructed the jury that if *"each of these"* propositions were proved beyond a reasonable doubt, it should find defendant guilty, and if *"any one of these"* propositions were not proved beyond a reasonable doubt, then defendant should be found not guilty.

Our review of the instructions leads us to conclude that those given to the jury did in fact misstate the burden with regard to a finding of not guilty. The IPI Criminal 2d instructions provide that if the State fails to prove only one of the two elements of first degree murder, the jury should find the defendant not guilty. The instructions the jury received, however, provide that if the State fails to prove *both* elements of the offense, then the defendant should be found not guilty.

We find, however, that this error was harmless in light of our conclusion that defendant suffered no prejudice as a result. (*People v. Tiggs* (1976), 38 Ill. App.

3d 72.) Our conclusion is based on the jury's verdict of guilty. Under the instructions the jury received as well as under the IPI Criminal 2d instructions, in order to reach a verdict of guilty, the jury had to find that the State had proven both propositions beyond a reasonable doubt. The jury's verdict shows that they found that the State proved both elements of the crime. Any error present in the not-guilty instruction did not result in any prejudice to defendant, as the jury found that both propositions had been proven beyond a reasonable doubt.

Defendant next argues that he received ineffective assistance of counsel when his attorney argued at the first stage of the sentencing hearing that defendant would sustain his burden to show that defendant's life should be spared. Defendant argues that because he did not have the burden of proof at either stage of the sentencing hearing, his right to effective assistance of counsel guaranteed by the sixth and fourteenth amendments was denied. We find that any errors that may have been committed by defendant's counsel at the sentencing did not result in any prejudice to defendant. *Strickland v. Washington* (1984), 466 U.S. 668, 697, 80 L. Ed. 2d 674, 699, 104 S. Ct. 2052, 2069.

In his opening statement at the first stage of the sentencing hearing, defense counsel made the following statement:

> "As you will recall, I told you then whatever decision you reached—that you reached, even if it was contrary to what I believed that the evidence showed, if you truly believed that that was a fair decision, then I accept that decision. *** I would merely say to you that you have done what you think fair. That's your job to do as American citizens; we accept that. We will go forth in our opposition. We think we will sustain our burden that [defendant] is a man whose life should be spared."

Defendant argues that counsel's statement incorrectly asserted that defendant had the burden of proof at the sentencing hearing and this statement "substantially increased the risk that death was imposed."

*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, established the standard by which claims of ineffective assistance of counsel are to be measured. To be successful on such a claim, the defendant must show both that (1) counsel's performance was so seriously deficient as to fall below an objective standard of reasonableness under prevailing professional norms and (2) that the deficient performance so prejudiced the defense as to deny the defendant a fair trial. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; see *People v. Williams* (1991), 147 Ill. 2d 173, 235.

In raising a claim of ineffective assistance of counsel, a defendant is faced with the strong presumption that the challenged action "might be considered sound trial strategy." (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.) Moreover, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064.

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *** If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Our review of the record shows that, despite defense counsel's comment, the trial court properly instructed the jury with regard to the State's burden at the first stage of the hearing. Among other references to the respective burdens at the sentencing hearing, the court told the jury the following: "[T]he State has to meet a burden of proof beyond a reasonable doubt that under the law the Defendant would qualify for the death penalty, and so the attorneys for both sides can make argument on that"; "the burden is on the State at this type of hearing"; and "the State has the burden of proving beyond a reasonable doubt that the Defendant is eligible for a death sentence under the law, and this burden remains on the State throughout the first part of the death penalty hearing. The Defendant is not required to prove that he is ineligible for a death sentence." Although defense counsel's use of the word "burden" may have been inappropriate, we do not believe it resulted in any prejudice to defendant in light of the fleeting nature of the comment as well as the court's repeated instructions to the jury that properly discussed the State's burden at the hearing. We, therefore, dispose of defendant's claim on the basis that no sufficient prejudice resulted as a result of defense counsel's statement.

Defendant next contends that it was error for the trial court to instruct the jury that it could consider his potential for rehabilitation as a mitigating factor at the second stage of the sentencing hearing. Defendant argues that because the only statutory alternative to the death penalty was life imprisonment, it was error to instruct the jury to consider his potential for rehabilitation.

At the second stage of the death penalty hearing, the State tendered an instruction that included as a mitigating factor for the jury's consideration the poten-

tial that "the defendant may be rehabilitated or restored to useful citizenship." Defense counsel objected to the instruction, which objection was overruled by the trial court. In its ruling, the court concluded that evidence defendant had presented regarding the circumstances of his childhood and mental problems "would have to be considered as [inter alia] an indication to the jurors that there is some possibility of rehabilitation even though it might have to occur while incarcerated, which should be an argument to spare the defendant's life."

This court has considered this issue before in its decisions in *People v. Lego* (1987), 116 Ill. 2d 323, 350, and *People v. Albanese* (1984), 102 Ill. 2d 54, 79. In both decisions, the court observed that the " 'potential for rehabilitation is a constitutionally mandated factor to be considered by the sentencing authority.' " (*Lego*, 116 Ill. 2d at 351, quoting *Albanese*, 102 Ill. 2d at 79.) We rejected the defendants' arguments in these decisions, and because defendant has given this court no reasons to reconsider our decisions on this issue, we hold that it was not erroneous for the court to so instruct the jury. See also *People v. Taylor* (1984), 102 Ill. 2d 201.

Defendant next argues that an outburst from Mrs. Taylor during closing argument at the sentencing hearing, coupled with the trial court's admonishment to the jury subsequent to the incident, is analogous to the victim impact statement condemned in *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529. Defendant further argues that a statement made by the prosecution during the closing argument at the sentencing stage was improper.

We believe the court took the proper precautions in instructing the jury to disregard the outburst and having Mrs. Taylor removed from the courtroom for the

remainder of the closing statements. The outburst was brief and Mrs. Taylor's statement was ambiguous. We agree with the the trial court's finding that there was no prejudice to defendant as a result of the outburst and affirm the court's ruling denying a new impanelment.

During defense counsel's closing argument, the following occurred:

> "Defendant: All I'm saying to you is this is the not the crime to give out the death penalty for.
>
> Mrs. Robert Taylor (seated in the spectator area): What is the crime? What is the crime?
>
> THE COURT: Excuse me. Excuse me. I would ask that she be taken out.
>
> Defendant: Could we have a side-bar?
>
> THE COURT: Surely.
>
> Ladies and gentlemen, I've tried to admonish everyone, however they may be connected with this case, not to have any outburst; and Mrs. Taylor just made an outburst, and I've asked that she be removed. And she's going to have to remain outside until and unless she can satisfy me that she can control her emotions. That has—excuse me—that has no part of the case on what family members from either side may feel should happen, and all I can tell you is you must disregard any such outburst from whatever source and not consider that because that's not evidence—that's not what we're here about. That's not how you make your decision.
>
> Now, [defense counsel], if you would like to further have a side-bar at this time.
>
> Defendant: Judge, I will state what I have for the record after I conclude my argument.
>
> THE COURT: Okay. You may proceed. I'm sorry for that."

A side bar was later held outside the presence of the jury where defendant requested that a new sentencing jury be impaneled. In ruling on the motion the court considered the brevity of the outburst and the at-

tendant disruption in the courtroom before Mrs. Taylor left the spectator area. Based on the jury's "lack of reaction" to Mrs. Taylor's outburst, the court denied defendant's request that a new sentencing jury be impaneled. After the jury returned to the courtroom, the court again instructed the jury to disregard any outbursts from anyone in the courtroom.

Defendant asks this court to reverse the trial court's ruling on this motion in light of the United States Supreme Court's decision in *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529. In *Booth*, the Court held that introduction of victim impact statements at the sentencing phase of a capital murder trial violated the eighth amendment, concluding that "what conclusions the jury should draw from [this] evidence clearly is inconsistent with the reasoned decisionmaking we require in capital cases." (*Booth*, 482 U.S. at 508-09, 96 L. Ed. 2d at 452, 107 S. Ct. at 2536.) Defendant maintains that "it matters not whether the information is obtained through admitted evidence, or from an outburst by the victim's family and the resulting admonitions from the trial court"; both forms of information are irrelevant to a capital sentencing decision. See *Booth*, 482 U.S. at 502-03, 96 L. Ed. 2d at 448, 107 S. Ct. at 2533.

The Supreme Court recently reconsidered its holding in *Booth* as well as its later decision in *South Carolina v. Gathers* (1989), 490 U.S. 805, 104 L. Ed. 2d 876, 109 S. Ct. 2207, where the Court extended the holding of *Booth* barring victim impact evidence to the prosecutor's argument to the jury. (*Payne v. Tennessee* (1991), 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597.) After reviewing the reasoning of its decision in *Payne*, the Court concluded that it was "now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral cul-

pability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." (*Payne*, 501 U. S. at 825, 115 L. Ed. 2d at 735, 111 S. Ct. at 2608.) Likewise, the Court rejected the view expressed in *Gathers* and held that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Payne*, 501 U.S. at 827, 115 L. Ed. 2d at 736, 111 S. Ct. at 2609.

We do not believe defendant's reliance on *Booth* is appropriate nor do we believe the Court's decision in *Payne* is applicable to the case at bar. *Payne* clearly resolves the issue of the admissibility of victim impact evidence at the sentencing hearing as well as the propriety of the prosecutor's discussing the evidence in his closing argument. However, in the present case, the trial court was not faced with deciding the admissibility of victim impact evidence and prosecutorial argument on that subject. Rather, the trial court was faced with assessing the prejudice, if any, resulting from an outburst from the victim's family during the defense counsel's closing argument.

Obviously, whatever statement made by Mrs. Taylor was not evidence. The issue, therefore, of its admissibility is inappropriate. Even in light of the Supreme Court's decision in *Payne*, the jury was not entitled to consider Mrs. Taylor's outburst in determining whether to impose the death penalty, nor was the prosecutor entitled to comment on the outburst in his closing statement. As the trial court stated, the jury could not consider the outburst in its deliberations "because that's not evidence."

Defendant next argues that statements made by the prosecutor in his closing statement were improper and warrant a new trial. No objection was made to these

statements at trial and defendant failed to include them in his post-trial motion for a new trial. As a result of these omissions, these alleged errors are waived for purposes of appeal. (*People v. Barrow* (1989), 133 Ill. 2d 226, 270.) Again, plain error is inapplicable in the instant matter. *People v. Mack* (1984), 105 Ill. 2d 103, 131-32.

Defendant next argues that the jury was improperly presented at the sentencing hearing with evidence of numerous offenses for which defendant had been charged but not convicted. These offenses were in fact disciplinary reports issued while defendant was an inmate at Pontiac and included 154 reports between June 1982 and 1989.

Read testified at the second phase of the sentencing hearing that the disciplinary reports issued to defendant included six reports for assault, 30 for insolence or threats, 52 for disobeying orders, 64 for unauthorized movement, three for gang activity, four for dangerous contraband, and two for drugs and paraphernalia. Read was unable to testify to the number of charges, if any, which resulted in the Department equivalent of a conviction.

As defendant rightly points out in his brief to this court, we have considered this issue in earlier decisions and held that evidence of other crimes is admissible even though the defendant was not convicted of the crimes. (See *People v. Ramirez* (1983), 98 Ill. 2d 439, 460-61; *People v. La Pointe* (1981), 88 Ill. 2d 482, 494.) " 'Whether a defendant has been prosecuted and convicted for other misconduct, proof of which is offered at a sentencing hearing, is not, in our judgment, controlling as to its admissibility. More important are the questions of relevancy and accuracy of the information submitted.' " (*Ramirez*, 98 Ill. 2d at 461, quoting *La Pointe*, 88 Ill. 2d at 498.) Defendant asks us to re-

consider and reject our position, but fails to offer any arguments in support of his position. We continue to adhere to this position and, accordingly, hold that the admission of defendant's disciplinary record did not deny defendant a fair sentencing hearing.

In his final two arguments, defendant challenges the Illinois death penalty statute (Ill. Rev. Stat. 1987, ch. 38, par. 9—1) arguing that various aspects of the statute violate the eighth and fourteenth amendments. These same arguments have been rejected on other occasions and defendant does not now present any arguments that warrant our reconsideration of those holdings. See *Howard*, 147 Ill. 2d at 171.

Defendant also argues that the death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. Again, as with defendant's other arguments regarding the death penalty, this court has previously considered and rejected this argument.

For the reasons stated, defendant's convictions and sentences are affirmed. The clerk of this court is directed to enter an order setting Tuesday, September 22, 1992, as the date on which sentence of death, entered in the circuit court of Livingston County, is to be carried out. Defendant shall be executed in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

*Judgment affirmed.*